THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIJAH STANCIEL *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—88—0416, 1—88—0417 cons.

Opinion filed December 11, 1991.—Rehearing denied March 26, 1992.

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant Violetta Burgos.

Kenneth Jones and Philip Kujowa, both of State Appellate Defender's Office, of Chicago, for appellant Elijah Stanciel.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Loren A. Seidner, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Defendants, Elijah Stanciel and Violetta Burgos, appeal from their convictions of murder of a three-year-old child, Electicia Asbury, who was Burgos' daughter (the child). Stanciel argues on appeal that: (1) he was illegally arrested; (2) his sixth amendment right to confront witnesses against him was violated by the trial court's consideration of codefendant Burgos' statement in finding him guilty of murder; (3) he was deprived of a fair trial because the trial court considered the irrelevant testimony of bite marks on the child's body; and (4) his sentence of 60 years' imprisonment was an abuse of discretion. Burgos argues on appeal that: (1) the State failed to prove beyond a reasonable doubt her guilt of murder on the basis of accountability; and (2) her sentence of 60 years' imprisonment was an abuse of discretion.

During the hearing on the motion to suppress, there was testimony that Burgos stated that the child was injured when she fell while carrying the child up some stairs. She further stated that she temporarily lost custody of the child in 1984 after the child suffered

a broken leg in a child abuse case. The police learned that the lease for Burgos' apartment was in the name of Stanciel, who was Burgos' boyfriend and who had been charged in 1984 with fracturing the child's leg.

Witnesses for the State testified that Detectives Gildea and Stevens and two youth officers arrived at Stanciel's apartment at about 6:30 a.m. Stanciel answered their knock on the door. They asked Stanciel if they could come into the apartment, and Stanciel consented. Stanciel's help was requested in the investigation of the child's death. He was asked if he would come to their "office." Stanciel was told he did not need to accompany them to the police station. He agreed to go with them, and he was taken without handcuffs in a police car.

At the police station, Stanciel was placed in an interview room. Stanciel told the police that he still had a relationship with Burgos and that he had contact with Burgos as recently as the date of the child's death. The police left him in the interview room and went into another room to talk with Burgos. Burgos was told that Stanciel said that she and the child had stayed overnight at his apartment and that this was contrary to what she had stated before. She then admitted that she still had a relationship with Stanciel and that she and the child had stayed overnight at his apartment. Burgos said that she had been reluctant to admit her relationship with Stanciel because after the 1984 incident, the child had been taken away from her, and one of the conditions of returning custody to her was no contact with Stanciel. She maintained a separate address from him. She stated that Stanciel had punched the child.

The police then returned to talk with Stanciel and advised him of his constitutional rights. Stanciel then made an incriminating statement. The incriminating statement was made about 30 minutes after defendant was placed in the interview room. Felony review was contacted, and Assistant State's Attorney Gonzalez responded. She advised Stanciel that she was an assistant State's Attorney, but that she was not his attorney. She advised him of his *Miranda* rights, and he responded that he understood each right. She asked him if he wished to speak to her, and he said yes and that he wanted to set everything straight. He spoke to her, and she asked him whether he wanted to give a written statement or a court-reported statement. He said no because he had a vision problem and could not read well. He then made incriminating statements. Later, in response to Stanciel's questions, she told him that he could not

go home and that he was charged with murder. He said he wanted to speak to an attorney to see whether or not he should give a statement. She informed him that she could not speak to him anymore because he wanted to speak to an attorney. No further questions were asked.

At the hearing on Stanciel's motion to suppress, the trial court indicated that then and at defendants' joint trial, it would consider a codefendant's statements only in connection with that codefendant.

Stanciel testified to the following at the hearing. He was 26 years old, single, and had been legally blind since birth. At 6 a.m. on April 20, 1986, he was alone in his apartment when there was a knock on the door. He asked who was there, and the police answered. Someone said to open up, and he opened the door. The police pushed their way into his apartment. One of the detectives had a long black stick, which he pushed against Stanciel's chest. Stanciel then backed up to his closet, and three other detectives came in. The four detectives remained in the apartment while he got dressed. The largest of the detectives handcuffed him in the back. They led Stanciel to the car although he had not agreed to go to the police station. He was put in the back seat and taken to the police station.

Stanciel was led to an interview room. One hand was cuffed to the wall, but he was able to sit down. Stanciel was questioned by police.

Later that afternoon, questioning resumed by Detective Baldree. Stanciel still had not been advised of his rights. Baldree told Stanciel that he was going to take a hair sample and teeth tests. Baldree returned, removed the handcuffs, and took Stanciel for the tests. Teeth prints and hair were taken from him.

After the tests, Baldree told Stanciel he was not going to make any telephone calls. He handcuffed Stanciel to the wall again and left. Later, Baldree told Stanciel he wanted Stanciel to talk to the State's Attorney, and he put something up, that he could not see, against Stanciel's head. Baldree said that he would blow Stanciel's head off and referred to Stanciel's refusal to talk to the State's Attorney and to sign papers. Stanciel then agreed to sign papers because he was scared for his life. Baldree left the room and returned with the State's Attorney, whom he told that he wanted to see an attorney. She stepped out of the room with Baldree. When she returned, she said that he could see an attorney now, which was the first time he had been advised of his right.

The trial court denied Stanciel's motion to suppress.

Defendants waived the right to a jury trial.

Police officer Gildea testified to the following at the trial. Burgos related the following to him. She could not account for the injuries to the child other than her fall while taking the child upstairs. When she got to the apartment, she noted that the child was not breathing. She took the child inside and poured water down her throat and placed her in a bath in an attempt to revive her. When that failed, she wrapped the child up and called 911. In 1984, the child suffered a broken leg in a case of child abuse and Burgos temporarily lost custody, and Burgos got custody back in October 1985.

In response to Gildea's question how the child received the injuries that caused her death, Burgos related the following. She and the child were at Stanciel's apartment at approximately 10 a.m. when the child urinated on the floor. Stanciel spanked the child. Later, when the child spit up on the floor, Stanciel punched the child twice in the stomach. After spending some more time at the apartment, the child became unconscious. Burgos left the apartment and carried the child, who could not walk. They fell going upstairs, and she tried to revive the child but could not revive her. Burgos also stated that since March, Stanciel had taken over the disciplining of the child, and the punishment sometimes involved spanking (sometimes with a strap) and sometimes exercises, such as headstands.

Gonzalez spoke to Stanciel, who related the following. He was in charge of disciplining the child since March 1986. He disciplined her by spanking, using a belt, and by striking. On three occasions, he used a belt with a buckle. On April 19, the child urinated on the floor and he spanked her twice on the buttocks. Later, she spit up food, and he struck her twice on the left side of her stomach area with a closed fist. She then vomited the food but refused to pick up the food. He struck her once more on the side of her stomach with his closed fist.

Gonzalez spoke to Stanciel again in the evening, and Stanciel related the following to her. After the spanking incident, he patted the child, who fell on her knees, and that is how she received a forehead injury. In the afternoon, after the child spit up her food, he punched her on the side of the stomach because her buttocks were too raw. Later, Burgos called him and said that something was wrong with the child. He met them in the alley, and at that time the child was limp and unconscious. He carried the child to Burgos' building, and Burgos tried to revive her.

Stanciel also related the following. He bit the child once in the back of the ear and on the chin, and he pointed out on photographs these bite marks as well as forehead marks and the bruised area of her stomach that he caused by punching her at least three times. The marks on her arms probably resulted from his grabbing her. The marks on her legs were probably from his disciplining her.

Gildea testified that Stanciel related the following to him. He had taken over the child's discipline for some months. On many occasions, he administrated punishment, including beatings with a belt, exercises and striking in various manners. After the child urinated on the floor of his apartment, he spanked her. Hours later, the child spit up on the floor, and he punched her twice in the stomach with a closed fist. Some hours later, Burgos and the child left.

Dr. John P. Kenney testified at the trial to the following. He was a pediatric dentist and he also served as chief consultant forensic dentist for the Cook County medical examiner's office. He examined the child's body, which was covered with numerous bruises and marks. There were approximately 26 injuries that could have been caused by teeth. Teeth were very individual and would leave identifiable marks in the objects bitten. Bite marks on the child were matched with models of defendants' teeth. The bite on the right arm, the older bite mark on the right buttock, and two marks on the back were consistent with Burgos' teeth. The bite mark on the right thigh corresponded with Stanciel's teeth. The marks inflicted by Burgos were done over a long period of time. There were several bite marks on the body that he was not able to individualize, but some of them were self-inflicted. He was not qualified to determine whether any of the wounds contributed to the child's death.

Dr. Mitra Kalekar testified that she was deputy medical examiner for Cook County and that her field of expertise was forensic pathology. She performed an autopsy on the child and testified to numerous scars, lacerations, bruises, and abrasions on the child's body, including her face, head, chest, abdomen, back, extremities, and vagina. Dr. Kalekar conducted an internal examination of the child that revealed a ruptured intestine and injuries to the bowels and to the liver. These injuries were sustained as a result of blunt trauma about her abdomen.

Death was caused by multiple injuries, which were sustained as a result of multiple repeated blunt force injuries to the child's body. But the liver laceration, the intestinal tear, or the head injuries could have killed her. The blunt trauma and the abscess on the but-

tocks could have killed her eventually. Dr. Kalekar could not determine that a particular injury was the cause of the death by blunt trauma. Blunt trauma could result from falling, but the majority of the injuries was not caused as a result of falling, including the lacerations of the liver and the small intestine. The injuries to the liver and intestine occurred up to 12 hours prior to death.

There was a stipulation that Stanciel was 26 years old, Burgos was 23 years old, and that the child was three years old.

The trial court made the following findings at the close of the evidence. The brutality of the child existed over a long period of time. There was no question that defendants inflicted the bite marks, but there was no strong evidence that there was any penetration into the child's vagina. There was no one else around except defendants when she was beaten. The court stated:

"In their statement they say this individual here, this man, was beating this child and Ms. Burgos did nothing."

The trial court found that both defendants contributed to the child's death and found defendants guilty of murder. There was a finding of not guilty as to aggravated criminal sexual assault.

Motions for a new trial were denied.

The presentencing report on Stanciel stated that he was visually impaired, that he graduated from the Illinois School for the Visually Impaired, that he took additional college courses, that he had been employed as a food manager for 3½ years, that he was single and never married, and that he had a one-year-old daughter being cared for by the Department of Children and Family Services.

Each defendant was sentenced to an extended term of 60 years' imprisonment.

Stanciel first argues on appeal that he was illegally arrested by the police officers. The test is whether a reasonable innocent person would have considered himself arrested or free to leave. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766, 768.) An arrest takes place when the police inform defendant of a violation, the person submits to their control, and the evidence clearly shows that police intended to effect an arrest and that the defendant so understood them. (*People v. Bradford* (1981), 97 Ill. App. 3d 998, 1002, 423 N.E.2d 1179, 1183.) A trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 162-63, 535 N.E.2d 837, 841.

■ The trial court believed the testimony that Stanciel was asked whether he would accompany the police to assist in the inves-

tigation of the child's death and that he was told that he did not have to do so. At the hearing on a motion to suppress, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*Galvin*, 127 Ill. 2d at 163, 535 N.E.2d at 841.) The visit was not so early in the morning that as a matter of law Stanciel's consent was involuntary. The fact that the police could have asked Stanciel by telephone to assist but instead made the request in person also did not render his consent involuntary. There was no evidence that Stanciel was coerced other than his own testimony, which the trial court rejected. During criminal investigations police officers may question persons, and persons have a duty to cooperate with them. (*People v. Miller* (1980), 89 Ill. App. 3d 973, 977, 412 N.E.2d 175, 179.) What matters is whether a citizen's freedom has been restrained, not the place where the police question a person. (*Miller*, 89 Ill. App. 3d at 977, 412 N.E.2d at 179.) As stated in *Miller*, the totality of the circumstances was not such that a reasonable, innocent person would have considered himself not free to leave. The fact that Stanciel made an incriminating statement approximately 30 minutes after being placed in the interview room also indicates Stanciel was not being held under arrest.

Stanciel argues that his statement also should be suppressed on the basis that he was threatened and beaten. But again, the trial court could have disbelieved this testimony and found that Stanciel's statement was freely given.

We hold that the denial of the motion to suppress was not manifestly erroneous.

Stanciel argues that his sixth amendment right to confront witnesses against him was violated because the trial court considered Burgos' statements that Stanciel was in charge of disciplining the child and that he spanked and punched the child. Stanciel refers to the trial court's statement that "[i]n their statements they say this individual here, this man, was beating this child and Ms. Burgos did nothing."

The State responds that the trial court was aware of the law and considered only the admissible evidence as it pertained to Stanciel, and the State refers to the trial court's statements that it was separating the evidence as to each defendant. The State contends that the trial court's statement referring to "their" statement that Stanciel beat the child did not establish that the trial court considered inadmissible evidence because the trial court overruled objec-

tions to evidence on the basis that it would not consider that evidence against Stanciel.

A criminal defendant is deprived of the right under the sixth amendment to confront the witnesses against him in a jury trial when evidence is introduced of a non-testifying codefendant's incriminating extrajudicial statements. (*Bruton v. United States* (1968), 391 U.S. 123, 135-36, 20 L. Ed. 2d 476, 485, 88 S. Ct. 1620, 1627-28.) The confrontation clause bars admission of a nontestifying codefendant's confession incriminating defendant at defendants' joint trial, even if the jury is instructed not to consider it against defendant and even if defendant's own confession is admitted against him. (*Cruz v. New York* (1987), 481 U.S. 186, 193, 95 L. Ed. 2d 162, 172, 107 S. Ct. 1714, 1719.) The confrontation clause is also violated where the trial court, in a bench trial, relies on a codefendant's confession as substantive evidence against defendant because a codefendant's confession is inherently unreliable. *Lee v. Illinois* (1986), 476 U.S. 530, 531, 546, 90 L. Ed. 2d 514, 520, 530, 106 S. Ct. 2056, 2057, 2065.

It is to be presumed that the trial court, sitting as the trier of fact, considered only competent evidence. (*People v. Vinson* (1977), 49 Ill. App. 3d 602, 607, 364 N.E.2d 364, 368.) A defendant is not deprived of his sixth amendment right to confrontation in a bench trial in which there was evidence of a codefendant's inculpatory statements because of the trial judge's ability to restrict his use of improper evidence. (*People v. McNeal* (1977), 56 Ill. App. 3d 132, 138-39, 371 N.E.2d 926, 931-32.) Defendants are not prejudiced by the trial court's reading of each defendant's statement where the trial court specifically states that it would not consider what one said against the other. *People v. Monroe* (1984), 125 Ill. App. 3d 592, 595-96, 466 N.E.2d 393, 395-96.

■ Even if the trial court relied on Burgos' statement to find that Stanciel beat the child, any such error was harmless because there was sufficient evidence to find Stanciel guilty where he confessed to hitting the child, where physical evidence corroborated that the child received injuries to the liver and intestine that were consistent with a punch in the stomach, and where there was evidence that the child died from multiple blunt trauma.

Stanciel next argues that the trial court's consideration of testimony of the forensic dentist that some bite marks matched his teeth deprived him of a fair trial and that the marks were irrelevant where: (1) the cause of death was multiple blunt injuries; (2) the indictment alleged that defendants killed the child by beating

her with hands and a belt; (3) the medical examiner did not testify that the bites contributed to the death; and (4) the fact that Stanciel bit the child did not make it more or less likely that he was responsible for the blunt force injuries that caused the child's death.

The State first responds that the issue was waived because Stanciel did not timely object to the relevance of the forensic dentist's testimony, did not raise the issue in his motion for a new trial, and permitted the line of questioning about the bite mark evidence by stating that he had no objection to a narrative explanation by Dr. Kenney about the process of comparing defendants' teeth to the bite marks.

Whether or not the issue was waived, the issue should be addressed because the admission of irrelevant and prejudicial evidence would have denied defendant a fair trial. See *People v. Young* (1989), 128 Ill. 2d 1, 46-47, 538 N.E.2d 461, 471 (plain error rule permits consideration of an alleged error affecting substantial rights).

■ The State argues that the evidence of the prior acts of abuse was relevant to show Stanciel's state of mind where the State had to prove that Stanciel acted with the intent or knowledge that his acts would cause death or great bodily harm.

The State relies upon the following cases. In *People v. Heredia* (1989), 193 Ill. App. 3d 1073, 550 N.E.2d 1023, defendant was convicted of the voluntary manslaughter of his wife, who died of multiple gunshot wounds. The court held that evidence of his alleged prior assault of his wife was relevant to defendant's relationship with his wife where he argued that his actions were accidental or reckless. (*Heredia*, 193 Ill. App. 3d at 1086, 550 N.E.2d at 1031.) In *People v. Wachal* (1987), 156 Ill. App. 3d 331, 509 N.E.2d 648, defendant, who was tried for voluntary manslaughter of a child, argued that the trial court erroneously admitted evidence of his prior abuse of the child, including some bruises and bite marks. Defendant had hit the child with his arm and fist, and the court held that the evidence was relevant to the issue of defendant's intent or mental state at the time he struck the child the final time. *Wachal*, 156 Ill. App. 3d at 336, 509 N.E.2d at 652.

Stanciel does not attempt to distinguish these cases or to argue that the bite mark evidence was irrelevant to show his state of mind. We hold that the bite mark testimony of Dr. Kenney was relevant to show that Stanciel intended to do great bodily harm to the child when he hit her.

Stanciel next argues that his sentence of 60 years' imprisonment was an abuse of discretion because the trial court failed to consider his rehabilitative potential, lack of prior convictions, and consistent employment history despite his blindness. He also argues that the trial court's rejection of a death sentence was a finding that his conduct was not brutal or heinous because a death penalty could be imposed if the death of a child (under 12 years old) resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).

Stanciel was eligible for an extended-term sentence because the felony was committed against a victim under 12 years of age. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)(i).) The possible sentence for murder was 20 to 40 years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a)) or natural life imprisonment if the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty" or if any of certain aggravating factors were present (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)). An extended-term sentence for murder was 40 to 80 years' imprisonment. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(1).

■ We hold that Stanciel's mid-range extended-term sentence was not an abuse of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883 (absent an abuse of discretion, the sentence of the trial court may not be altered upon review).

Burgos argues that her conviction for murder based on accountability should be reversed because there was no evidence that she aided Stanciel in the murder and because the evidence was that she was only present during the beating and did nothing more besides renew her relationship with Stanciel and permit him to discipline her child. The State responds that Burgos was accountable for the child's death because: (1) she was present; (2) she permitted Stanciel to assume the role of disciplinarian; (3) she covered up Stanciel's involvement in the crime; (4) she was aware of Stanciel's physical punishments and permitted them to occur and continue; (5) she subjected her child to this brutal treatment by bringing the child to Stanciel's apartment; (6) she participated in prior beatings; and (7) she enabled Stanciel to fatally abuse her child where Stanciel had no access to the child other than through Burgos.

The relevant section of the accountability statute states:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he so-

licits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 5—2.

The elements of accountability were stated in *People v. Valen* (1989), 183 Ill. App. 3d 571, 577, 539 N.E.2d 261, 264, to be: (1) defendant elicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; (2) this participation took place before or during the commission of the offense; and (3) there was a concurrent, specific intent to promote or facilitate the commission of the offense. Mere presence at the scene of a crime, even with knowledge that the crime is being committed, is not enough to prove participation. *Valen*, 183 Ill. App. 3d at 577, 539 N.E.2d at 264.

■ Burgos may have been guilty of neglect of the child in this case. But the issue is whether there was sufficient evidence to prove beyond a reasonable doubt that she aided, abetted, or encouraged Stanciel to punch the child in the stomach with sufficient force to rupture the child's intestine and tear her liver.

The only evidence of Burgos' actions that can be considered is her statement to the police. She stated that Stanciel had taken over the disciplining of the child, that sometimes the punishment involved spanking, and that Stanciel spanked and punched the child in her presence on that day. The child may not have died on that day if Burgos had not taken her to Stanciel's apartment, but the intent to facilitate the commission of murder cannot be inferred from Burgos' presence at Stanciel's apartment. There was no evidence that she permitted Stanciel to beat the child that day or at any other time. There was no evidence either whether she disapproved or actively opposed Stanciel's hitting the child that day. Her mere presence during the beating is insufficient to find that she aided the commission of murder. (*People v. Carpenter* (1979), 74 Ill. App. 3d 770, 775, 393 N.E.2d 50, 54.) Burgos' murder conviction is therefore reversed.

The judgment of the trial court as to defendant Stanciel is affirmed, and the judgment of the trial court as to defendant Burgos is reversed.

No. 1—88—0416, Affirmed.
No. 1—88—0417, Reversed.

RIZZI and GREIMAN, JJ., concur.